Free speech is the issue involved, and, therefore, I enter my dissent to the decree appealed from, which justifies its suppression.
In 1865, immediately after the civil war, in which thousands of German immigrants, led by Schurz, Sigel, Heintzelman, Kudlich and others, had thrown themselves in the cauldron of the tremendous conflict, to preserve the integrity of the union, a desire to perpetuate the old traditions, language, music and scholarship led them to form various societies throughout the land. These societies were instrumental, not only in preserving memories of the valor and sacrifices of the race in the great internecine conflict, but served also as a means of preserving the memories of those great leaders of our revolutionary struggle, like Von Steuben, Muhlenberg and Herkimer, who did so much to assist as drill masters of the continental forces.
Among these organizations was Schiller Lodge of Masons, which was organized under the Grand Lodge of the Most Ancient and Honorable Society of Free and Accepted Masons, with a provision in its by-laws or charter that it "shall conduct all its affairs in the German language." For fifty years this lodge, without hindrance or objection from any source, so conducted its proceedings. When the great war ensued, in obedience to a proper recommendation from the grand lodge, it voluntarily ceased the use of the German tongue, and continued so to do until after the termination of the war, in the year 1919, when it resumed the use of German, in accordance *Page 344 
with its charter and contract right. To this the master of the grand lodge objected, and his objection was supported by the committee on masonic jurisprudence, and, eventually, by the resolution of the grand lodge. Schiller lodge, refusing to conform to the request of that body, the complainant, as master of Schiller lodge, was deposed; its charter was forfeited, and its property, including $3,000 in cash, was confiscated by the grand lodge.
Much masonic learning is recited in the briefs of learned counsel upon the essential fundamentals of masonry, in order to enlighten us upon the propriety of this procedure. It must suffice for one, whose knowledge of the order is entirely the result of early study, to remark that its great strength resided in a beautiful conception of an universality of purpose, and an entire absence of provincialism. It provided for a league of nations, bringing together in one communion of thought men of all nationalities and all tongues, under the inspiring creed of a Fatherhood of God and a brotherhood of man. Tennyson aptly depicts its purpose, as the realization of an era:
 "When the war drum throbs no longer, And the battle flag lies furled, In the parliament of man, The federation of the world."
If, as would appear from the procedure under consideration, this great conception of life is to be surrendered for an assumption of all the ills that selfish militant states are heirs to, then we have a situation in which masonry has been reduced to a status of provincialism and parochialism, and a luminous star that has lighted humanity over the deserts of destroyed empires and waning civilizations, has, indeed, lost its lustre and its attractive and powerful appeal to humanity. What was done in this instance with the lodge and its property could properly be effectuated under the circumscribed doctrines of other beneficial orders of state and national limitations but not under the inspiration of an order which, in its age-long and world-wide conception of brotherhood, *Page 345 
knows no language, color or creed, and no national boundaries or limitations.
Under this proscription of Schiller lodge, the stars of German literary and scientific life, the adopted sons of the world, Goethe, Jean Paul, Schiller, Schlegel, Hegel, Kant, Mozart, Hayden, Handel, Wagner, Straus, with many other world stellar lights, would be debarred from membership, not to mention Luther, who spoke only in German and Latin.
The legal question propounded is one of contract; for if Schiller lodge contracted with the predecessor of the grand lodge, through its by-laws, to "conduct all its affairs in the German language," some authority must be adduced which will warrant the breach of that contract by the grand lodge. No such authority is produced; nor is it contended that the grand lodge inherently possesses any such power, as was here exercised, under the tenets of masonry, except for a violation of the fundamental doctrines of the order, or as stated in the language of the proviso to the charter of Schiller lodge, unless the latter shall violate "the rules and ordinances lawfully made or to be made for the benefit of masonry."
In the cases presented by counsel, such as Grand Lodge,I.O.O.F., v. Wieland Lodge, 93 N.J. Eq. 129, the power to abrogate was conceded to exist in the grand lodge, for disobedience and infraction of rules. In those cases the grand lodge constituted the infallible guide and authority for the direction of local lodges, and the decisions are put upon that ground. Here no such power was conceded to the grand lodge, and under the tenets of masonry none exists, and the conspicuous facts dominating the entire situation is, that Schiller lodge, under the concession of its charter, exercised this contractual right of procedure for over fifty years, without hindrance or protest. This violation, not only contemned masonic fundamentals, but it violated the spirit of American constitutional law, in denying to the members the right of free speech in any language they might select.
The most notable recent instance, vindicating that right, isMeyer v. Nebraska, 262 U.S. 391, where it was held that "the *Page 346 
protection of the federal constitution extends to those who speak other languages, as well as those who speak English," and, further, that "An act of the legislature forbidding the teaching in school of any other than the English language, until the pupil has reached the eighth grade, violates the guaranty of liberty in the fourteenth amendment to the federal constitution, in the absence of a sudden emergency rendering knowledge of the foreign language clearly harmful."
In other lands, notably in England, and in polite society quite generally, education is not deemed complete without the addition of another language. Our highest educational institutions, including our public schools, when not rocked in the madness of war, have departments of belle lettres, which include the acquisition of some foreign language.
In Rome, according to Gibbon, "those who united letters with business were equally conversant with both Greek and Latin, and he informs us "it was almost impossible in any province to find a Roman subject of a liberal education who was at once a stranger to the Greek and to the Latin tongues." Gibb. Rome ch. 2.
The province of Quebec, for two hundred years, has maintained a stable government, using two languages, and Switzerland, the oldest republic extant, permits the use of three languages in official procedure. And, after all, it is not the language which one uses, which indicates the measure of the man, or the extent and profundity of his patriotism, but the heart, the mind and the soul that inspires his utterances. Indeed, were it otherwise, the condemnation visited upon the members of this lodge might well extend its potent influence, to suppress, at least, one member of this court, who occasionally points a moral and adorns a tale, by invoking the classic tongue of Virgil and Horace.
The decree should be reversed.